UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                 :

NORTH AMERICA PHOTON INFOTECH, LTD.,     :

                               :

             Plaintiff,           :

                               :        20 Civ. 2180 (JPC)

        -v-                      :

                               :      FINDINGS OF FACT AND

ZOOMINFO LLC,                       :      CONCLUSIONS OF LAW

                               :

             Defendant.       :

                               :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

North America Photon Infotech, Ltd. ("Photon") purchased a subscription to marketing databases from ZoomInfo LLC, retained ZoomInfo's data after their contract concluded, and provided some of the data to a third party. After the Court entered summary judgment for ZoomInfo on liability as to its breach of contract counterclaim, the Court held a bench trial on damages on June 24, 2022.[1] For reasons that follow, the Court finds that ZoomInfo is entitled to damages in the amount of $94,500.

## I.     Background

The Court assumes familiarity with the Court's prior decision on summary judgment in this case, including its recitation of the undisputed facts and procedural history. *See N. Am. Photon Infotech, Ltd. v. ZoomInfo LLC*, No. 20 Civ. 2180 (JPC), 2021 WL 4482208 (S.D.N.Y. Sept. 30, 2021) ("*Photon*").[2] Briefly, ZoomInfo provides marketing data for businesses, including profiles,

---

[1] The transcript of the bench trial is referred to herein as "Tr." *See* Dkt. 179-1.

[2] The publicly filed version of the September 30, 2021 Opinion and Order on summary judgment contains certain Court-approved redactions of information involving nonpublic,

contact information, and organizational charts of businesspeople.  *Id.* at *1.  On May 11, 2017, ZoomInfo entered into a contract, called the End User License Agreement ("EULA"), with Photon that allowed Photon to use the ZoomInfo database for twelve months.  *Id.*  ZoomInfo later extended the period during which Photon was authorized to access the database to May 16, 2018.  *Id.* at *2. The EULA required Photon to cease use of, and to destroy, ZoomInfo's data upon expiration of the agreement.  *Id.*  The EULA also required Photon to keep ZoomInfo's data confidential and to not allow third parties to access the data.  *Id.* at *3 n.8.

To detect wrongful use, ZoomInfo employs what it calls "seed records."  Seed records are entries with randomly generated names, along with associated email addresses and telephone numbers that are added to the data downloaded by clients for local use.  Dkt. 118 at 2.  The email addresses and telephone numbers listed for the seed records lead to ZoomInfo or one of its affiliates.  *Id.*  These seed records, which are unique to each download and therefore also to each ZoomInfo client, are included in addition to, not in lieu of, the records that the client selects for export.  *Id.* at 2-3.  At the time the EULA was in effect, up to one seed record could be inserted into exports of 30 to 1,000 records, up to two seed records could be inserted into exports of 1,000 to 10,000 records, and up to three seed records could be inserted into exports of over 10,000 records.  *Id.* at 3.  Thus, no single data set exported by Photon contained more than three seed records.  *Id*.

Using this technology, ZoomInfo detected two types of data use by Photon that violated the EULA.  First, Photon continued to use ZoomInfo's data after the expiration of Photon's

---

confidential business information.  The unredacted version of that Opinion and Order is filed under seal at Docket Number 118.

authorized use on May 16, 2018. *Photon*, 2021 WL 4482208, at *2. Second, Photon provided ZoomInfo's data to a third party called Packyge (and Packyge then used that data). *Id.* at *3.

On January 1, 2019, Photon sued ZoomInfo in California state court. Dkt. 1, Exh. B. ZoomInfo then removed the case to the U.S. District Court for the Northern District of California. Dkt. 1. On March 9, 2020, the case was transferred to this District. Dkt. 39. Photon then filed a Second Amended Complaint on April 7, 2020. Dkt. 49. On June 8, 2020, the Honorable Jed S. Rakoff granted ZoomInfo's motion to dismiss, dismissing all of Photon's claims except for its breach of contract claim, which alleged that ZoomInfo breached the EULA by failing to meet its data accuracy threshold and by knowingly providing false data, *i.e.*, the seed records. Dkt. 60. On June 22, 2020, ZoomInfo pleaded amended counterclaims, alleging that Photon breached the EULA by continuing to utilize ZoomInfo's data after the contract expired, Dkt. 61 ¶¶ 43-48, and, in the alternative, that Photon was unjustly enriched by this conduct, *id.* ¶¶ 49-54. Both parties moved for summary judgment on all remaining claims on September 18, 2020. Dkts. 63, 64.[3] The Court extended the summary briefing schedule to allow the parties to pursue a settlement conference before the Honorable Katharine H. Parker, but they were unable to reach a resolution of the litigation. *See* Dkts. 108, 113.

On September 30, 2021, the Court granted ZoomInfo summary judgment dismissing Photon's claims, *see Photon*, 2021 WL 4482208, at *4-6, and granted ZoomInfo summary judgment on its breach of contract counterclaim, finding that Photon's continued use of ZoomInfo's data after May 16, 2018 and its provision of ZoomInfo's data to Packyge breached the EULA, *see id.* at *6-7. The Court further explained that as a result of those breaches, ZoomInfo

---

[3] On September 29, 2020, the case was reassigned from Judge Rakoff to the undersigned. *See* ECF Minute Entry for Sept. 29, 2020.

was entitled to collect "the value Photon wrongly deprived ZoomInfo of by failing to perform, *i.e.*, the market value of Photon's continued use." *Id.* at *7.   The Court concluded that "[t]he same rationale extends to the damages associated with Photon's unauthorized sharing of ZoomInfo's data with Packyge." *Id.* at *8.

The Court held, though, that "factual disputes remain[ed] that could affect the calculation of damages," including "how long Photon continued to use ZoomInfo's data" and information regarding the value of ZoomInfo's data, such as "whether ZoomInfo regularly offers large discounts to customers, how long promotional discounts continue to apply, and whether any customers pay the full list price." *Id.*  The Court also reserved consideration of attorneys' fees until after resolving damages. *Id.* at *8 n.10.

On March 7, 2022, after mediation failed to resolve the damages dispute, the parties agreed to a bench trial on damages, with direct examination by affidavit and cross examination by live testimony. Dkt. 134.  At a conference on March 14, 2022, the Court confirmed those procedures and set a bench trial for June 24, 2022. Dkt. 135.

On June 3, 2022, both parties submitted direct testimony from their witnesses by affidavit. ZoomInfo presented testimony from Samantha Montgomery, its Senior Director of Revenue Operations, Dkt. 137-1 ("Montgomery Decl."), and from Josh Simon, a Product Manager II, Dkt. 137-2 ("Simon Decl.").  Photon presented testimony from Sanjiv Lochan, its Chief Financial Officer, Dkt. 145-1 ("Lochan Decl."), and Michael Levine, its Chief Marketing Officer, Dkt. 145-2 ("Levine Decl.").  On the same day, both parties also filed pre-trial memoranda of law.  Dkts.

141, 147.  The parties additionally submitted their trial exhibits to the Court in advance of the trial.[4]

Both parties filed motions *in limine* on June 15, 2022.  Dkts. 154 ("Photon Motion"), 158 ("ZoomInfo Motion").  Photon opposed ZoomInfo's motion on June 20, 2022, Dkt. 165 ("Photon Opposition"), and ZoomInfo opposed Photon's on June 22, 2022, Dkt. 169 ("ZoomInfo Opposition").  Without objection from the parties, the Court reserved ruling on the motions until the time of issuing its post-trial Findings of Fact and Conclusions of Law.  Dkt. 168.

The bench trial was conducted, as scheduled, on June 24, 2022.  *See* Tr.  Cross examinations of Montgomery and Levine occurred in person, while Lochan testified remotely.  *See* Tr.  With the consent of Photon, Simon did not appear for live testimony because Photon did not intend to cross-examine him.  Dkt. 168.  After the conclusion of the trial, both parties submitted post-trial memoranda on their proposed calculations of damages.  Dkts. 171 ("ZoomInfo Memorandum"), 174 ("Photon Memorandum").

## II.      Motions *In Limine*

The Court begins with resolving the pending motions *in limine* before turning to its Findings of Fact and Conclusions of Law.

### A.      ZoomInfo's Motion *In Limine*

#### 1.  Sanjiv Lochan

Photon filed Lochan's declaration containing his proffered direct testimony on June 3, 2022.  In that declaration, Lochan discussed the following topics: (1) the market value of a ZoomInfo subscription renewal, (2) the length of Photon's use of ZoomInfo's data after May 16,

---

[4] ZoomInfo's trial exhibits are referred to as "ZoomInfo Exh." and Photon's trial exhibits are referred to as "Photon Exh." herein.

2018, (3) Photon's efforts to purge ZoomInfo's data, and (4) the provision of ZoomInfo's data to Packyge.  Lochan Decl. ¶¶ 4-33.

ZoomInfo seeks to exclude Lochan's testimony in its entirety pursuant to Federal Rule of Civil Procedure 37(c)(1).  ZoomInfo Motion at 3-5.  That Rule instructs that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party" may not "use that . . . witness . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26, in turn, requires a party to "provide to the other parties . . . each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims," Fed. R. Civ. P. 26(a)(1)(A), and to "supplement or correct" that disclosure "in a timely manner if the party learns that . . . the disclosure . . . is incomplete . . . and . . . the additional . . . information has not otherwise been made known to the other parties," Fed. R. Civ. P. 26(e)(1).  Photon did not identify Lochan in its Rule 26 disclosures. *See* ZoomInfo Exh. AN.

Photon defends this omission by principally arguing that its reliance on Lochan was "otherwise . . . made known" to ZoomInfo, thus relieving Photon of any obligation to disclose his identity under Rule 26.  Photon Opposition at 1-3 (quoting Fed. R. Civ. P. 26(e)(1)(A)).  Photon maintains that ZoomInfo knew of Lochan's trial testimony from three sources.  First, Lochan authored a declaration dated March 28, 2019, before the transfer of this action from the Northern District of California, in opposition to ZoomInfo's motion to dismiss for lack of personal jurisdiction and improper venue.  *Id.* at 2 (citing Dkt. 15).  That declaration, however, exclusively described ZoomInfo's contacts with the Northern District of California.  *See* Dkt. 15.  It had nothing to do with the subjects of Lochan's proffered trial testimony.  Second, Photon produced in discovery one email that Lochan authored and two that he received.  Photon Opposition at 2

6

(citing Dkts. 68-5, 70-3, 70-6).  The email that Lochan authored was dated September 13, 2018

and was addressed to Montgomery.  Dkt. 70-6.  In it, Lochan expressed dismay at ZoomInfo's use

of seed records and claimed that Photon did not plan to renew its subscription with ZoomInfo

because it did not find ZoomInfo's data useful.  *Id.*  The emails that Lochan received concerned

the seed records.  *See* Dkts. 68-5, 70-3.  One email, dated September 17, 2018, was from another

Photon employee and included a table summarizing Photon's downloads of genuine and "seed

record" data.  Dkt. 68-5.  The other was dated August 30, 2018 and came from Levine, who

forwarded an email from Montgomery with attached examples of emails sent to seed record

accounts.  Dkt. 70-3.  Third, Montgomery's direct testimony—submitted the same day as

Lochan's—mentioned her discussions with Lochan, among others, regarding the possibility of

Photon renewing the contract, including the aforementioned September 13, 2018 email.  Photon

Opposition at 2-3 (citing Montgomery Decl. ¶¶ 79-80).

"The purpose of [Rule 26(e)] is to prevent the practice of 'sandbagging' an opposing party

with new evidence."  *Haas v. Del. & Hudson Ry. Corp.*, 282 F. App'x 84, 86 (2d Cir. 2008).  The

"made known" exception to Rule 26(e) clarifies that "there is no need as a matter of form to submit

a supplemental disclosure to include information already revealed."   *BanxCorp v. Costco*

*Wholesale Corp.*, 978 F. Supp. 2d 280, 323 (S.D.N.Y. 2013).  But a "passing reference," such as

a "mere mention of a name in a deposition or interrogatory response," "fails to satisfy" the

exception.  *Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 662 (2d Cir. 2018).  The disclosure

should "be the functional equivalent of a supplemental discovery response."  6 Moore's Federal

Practice § 26.131 (2022).  That burden is not onerous: a party may "satisf[y]" it "by a simple

declaration that they might call the individual as a trial witness, either in a letter, electronic mail,

on-the-record during another deposition or court proceeding, or the like." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 73 (E.D.N.Y. 2012) (quotations omitted).

Photon failed to meet that standard in disclosing Lochan in two respects.  First, the information identified by Photon, including its production during discovery of emails involving Lochan, at most indicated that Lochan "ha[d] discoverable information," not that Photon "might use" Lochan "as a witness," a central function of a Rule 26 disclosure.  *3DT Holdings LLC v. Bard Access Sys., Inc.*, No. 17 Civ. 5463 (LJL), 2022 WL 1569493, at *3 (S.D.N.Y. May 17, 2022). "The law is clear that a party's mere knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if the disclosing party informed the opposing party that it might call the witness."  *Raymond v. Mid-Bronx Haulage Corp.*, No. 15 Civ. 5803 (RJS), 2017 WL 1251137, at *9 (S.D.N.Y. Mar. 31, 2017) (cleaned up) (explaining that the production of a letter from a witness in discovery did not avoid the need for supplemental disclosure).[5]

Second, a proper Rule 26 disclosure includes not only the name of the "individual likely to have discoverable information," but the "subjects of that information."  Fed. R. Civ. P. 26(a)(1)(A)(i).  The three emails with Lochan revealed limited information concerning Photon's objections to the seed record mechanism, Photon's decision not to renew the EULA, and

---

[5] Some caselaw has suggested that a mention of a witness in evidence alone could be sufficient to satisfy Rule 26(e).  *See Banxcorp*, 978 F. Supp. 2d at 324; *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011).  But the weight of authority is to the contrary. *See 3DT Holdings LLC*, 2022 WL 1569493, at *3; *Williams v. Bethel Springvale Nursing Home, Inc.*, No. 14 Civ. 9383 (NSR), 2018 WL 1662644, at *5 (S.D.N.Y. Apr. 5, 2018); *Scalpi v. Amorim*, No. 18 Civ. 2126 (KMK), 2018 WL 1606002, at *14 (Mar. 29, 2018); *Downey v. Adloox, Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL 794592, at *1 (S.D.N.Y. Feb. 8, 2018); *Raymond*, 2017 WL 1251137, at *9; *Lebada v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 758 (LAK) (GWG), 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016), *report and recommendation adopted*, 2016 WL 8453417 (S.D.N.Y. May 16, 2016); *Lujan v. Cabana Mgmt., Inc.*, 384 F.R.D. at 72-73 (collecting cases).

ZoomInfo's evidence of Photon's unauthorized data use.  But as noted, Lochan's proffered testimony largely concerned other topics: the value of certain ZoomInfo features and of a renewal of the subscription, Lochan Decl. ¶¶ 4-19, Photon's efforts to cease its unauthorized use of ZoomInfo's data, *id.* ¶¶ 23-28, and Photon's provision of that data to Packyge, *id.* ¶¶ 29-33.  The three emails only arguably overlapped with Lochan's proffered trial testimony as to Photon's wrongful use of ZoomInfo's data.  *Id.* ¶¶ 20-22.  That overlap, however, does not excuse Photon's failure to notify ZoomInfo that it would use Lochan's testimony to support its claims, a requirement of Rule 26(e) as discussed previously.  Because even the supplemental material Photon points to was "in [a] material respect . . . incomplete," it cannot satisfy Photon's Rule 26(e) obligation.  Fed. R. Civ. P. 26(e)(1).

Having determined that Photon failed to comply with Rules 26(a) and 26(e) as to Lochan's testimony, the Court moves to the Rule 37(c)(1) analysis.  When considering whether to exclude testimony, a court examines "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (cleaned up).  Only the second factor, the importance of Lochan's testimony, moderately favors Photon because of his proffered testimony concerning the diminished value of a ZoomInfo subscription due to "data decay."  Yet, evidence on this subject was otherwise admitted at trial.[6] And the remainder of the factors favor exclusion.

---

[6] The Court admitted at trial certain ZoomInfo materials concerning data decay, *see* Photon Exhs. 3, 4, 5, and Photon's calculation of the value of data decay relies exclusively on those materials, rather than on Lochan's testimony, *see* Photon Memorandum at 9-10.  Lochan also discussed the length of Photon's use of ZoomInfo's data and related subjects, *see* Lochan Decl.

As to the first factor, Photon "has not yet explained why it omitted" Lochan "in its Initial Disclosure." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006). Indeed, Photon does not even claim that its nondisclosure was inadvertent. Without offering any explanation for the omission, Photo argues only that it did not prejudice ZoomInfo. *See* Photon Opposition at 4.

But ZoomInfo *was* prejudiced. Photon did not submit evidence from Lochan in support of its summary judgment briefing, and as discussed previously, ZoomInfo first received notice of Photon's intent to call Lochan and the bulk of the subject matter of his proffered testimony when Photon submitted that testimony shortly before the scheduled trial. *See Patterson*, 440 F.3d at 118 (affirming exclusion of witnesses when "[n]o evidence from these witnesses was submitted" on "summary judgment" and the plaintiff "first received notice of the witnesses, unaccompanied by any information concerning the nature of their testimony, shortly before trial"). Such a failure to disclose a witness until the eve of trial causes obvious prejudice to an adversary preparing its own trial proof, and allowing such testimony would give the offending party an unfair tactical advantage. To rebalance the parties, "the Court would be required—out of fairness—to permit [ZoomInfo] to reopen discovery, depose [Lochan], and proffer" rebuttal evidence of its own. *Rekor Sys., Inc. v. Loughlin*, No. 19 Civ. 7767 (LJL), 2022 WL 2063857, at *9 (S.D.N.Y. June 8, 2022). Photon speculatively suggests that ZoomInfo would not have deposed Lochan had he been disclosed. *See* Photon Opposition at 4. We will never know due to Photon's own conduct. And in any case, a rule allowing sandbagging of witnesses absent a demonstrable intent to depose would be untenable. The purposes of Rule 26 go beyond scheduling depositions.

---

¶¶ 20-33, but Photon's arguments on those matters similarly rely only on the seed record information, *see* Photon Memorandum at 8.

Finally, at this stage, a continuance is not an option.  Discovery closed on September 11, 2020, over twenty-one months before the June 24, 2022 trial date, and Photon only disclosed Lochan's importance when it submitted his direct testimony by affidavit on June 3, 2022.  The Second Circuit has previously explained that a disclosure "one and a half years" after the close of discovery and "a short time before trial" "weighed heavily" against the "possibility of a continuance." *Design Strategy, Inc.*, 469 F.3d at 297; *see also Patterson*, 440 F.3d at 118 (same); *Fleisig v. ED&F Man Cap. Mkts., Inc.*, No. 19 Civ. 8217 (DLC), 2021 WL 2494889, at *2 (S.D.N.Y. June 28, 2021) (explaining that "reopen[ing] discovery" "would cause needless expense and delay" after the plaintiffs' untimely disclosure of a damages calculation, in violation of Rule 26, in an affidavit submitted shortly before a bench trial).  Moreover, this case was initiated, in state court in California, over "three years ago," and "[a]t this point, [ZoomInfo] is entitled to its day in court." *Rekor Sys., Inc.*, 2022 WL 2063857, at *10.

Weighing these factors, the Court excludes Lochan's testimony in its entirety. *See Design Strategy, Inc.*, 469 F.3d at 297 (explaining that exclusion was proper even when evidence was "essential" to a damages theory, because the remaining factors "weigh[ed] heavily in favor of exclusion").[7]  While "the court . . . ha[s] discretion to impose other, less drastic sanctions," *id.* at 298, and indeed has considered any alternatives, the parties suggest no alternative to exclusion and none would be appropriate at this stage.[8]

---

[7] As Photon's only use of its Exhibits 6, 7, and 8 at trial was in Lochan's direct testimony, the Court does not consider those exhibits, which would not affect its ruling in any case.  While ZoomInfo also moved *in limine* with respect to Photon's Exhibits 3, 4, and 5, *see* ZoomInfo Motion at 1, it conceded that those exhibits are admissible under Federal Rule of Evidence 801(d)(2) as statements of a party-opponent, *see* Tr. at 3:21-4:5, and they were subsequently admitted, *see id.* at 5:19-6:1.

[8] In light of this holding, the Court does not reach ZoomInfo's other grounds for excluding specific parts of Lochan's testimony.  *See* ZoomInfo Motion at 6-22.

### 2.   Michael Levine

ZoomInfo objects to two portions of Levine's direct testimony.  *See* ZoomInfo Motion at 2 (citing Levine Decl. ¶¶ 4, 12).  First, Levine stated in his trial declaration that Photon was not satisfied with the rate at which ZoomInfo updated information.  *See* Levine Decl. ¶ 4.  ZoomInfo objects that Photon failed to contend that ZoomInfo's updates were unduly infrequent in Photon's response to a relevant interrogatory, *see* ZoomInfo Motion at 9-10 (citing ZoomInfo Exh. AL ¶ 8), and that Levine's testimony on the point is irrelevant, *see id.* at 13.

With respect to ZoomInfo's first objection, the interrogatory requested a description "in detail and with specificity how ZoomInfo's data was not 95% accurate," to which Photon responded:

> Photon had downloaded data using the [ZoomInfo] platform for use in its sales and marketing efforts.  A total of 26 databases were downloaded by Photon for use in the sales and marketing initiatives.  They consisted of 259,480 records, of which 1,009 had false/fake email ids and phone numbers, which is approx. 0.39% of the total data downloaded.  There was a total of 21,148 records or 8.15% of the records which did not have any sort of email id attached to them.  There was a total of 68,538 records or 26.41% of the records which had no phone numbers attached to them.

ZoomInfo Exh. AL ¶ 8.  In light of that interrogatory response, ZoomInfo seeks to preclude Levine's testimony as to the frequency of the updates pursuant to Federal Rule of Civil Procedure 37.  Rule 37(d) permits "[s]anctions . . . listed in Rule 37(b)(2)(A)," Fed R. Civ. P. 37(d), including "prohibiting the disobedient party from . . . introducing designated matters in evidence," Fed. R. Civ. P. 37(b)(2)(A)(ii).  But Rule 37(d) applies to parties that "serious[ly] or total[ly] fail[] to respond" to interrogatories, *Glencore Denrees Paris v. Dep't of Nat. Store Branch 1*, No. 99 Civ. 8607 (RJS), 2008 WL 4298609, at *4 (S.D.N.Y. Sept. 19, 2008) (quoting *Flaks v. Koegel*, 504 F.2d 702, 705 n.2 (2d Cir. 1974)), which did not occur here.  The interrogatory response addressed Photon's assessment of the inaccuracy of ZoomInfo's data, which was the subject matter of the

interrogatory.  *See* ZoomInfo Exh. AL ¶ 8.  As to the relevance objection, Levine's testimony with respect to the frequency of data updates is at least marginally relevant to determining the value of the services that ZoomInfo provided.  *See United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019) (explaining that "[r]elevance under the FRE is a low threshold, easily satisfied" when the evidence "has *any tendency* to make a [material] fact more or less probable").

Second, Levine testified to the contents of emails that Montgomery sent Photon after the dispute began.  *See* Levine Decl. ¶¶ 11-12; *see also* Photon Exhs. 14, 15 (the emails in question).  ZoomInfo objects that two communications of these are confidential settlement discussions that are inadmissible under Federal Rule of Evidence 408.  *See* ZoomInfo Motion at 13-14 (objecting to Photon Exhs. 11, 15).  The subject emails include explicit offers and counteroffers between the parties for the resolution of their ongoing disputes, including Photon renewing at the list price, ZoomInfo issuing Photon a refund, *see* Photon Exh. 11 at 3; Photon Exh. 15 at 1-2, or mutual disarmament, *see* Photon Exh. 11 at 2.  As such, the emails entail "offering . . . a valuable consideration in . . . attempting to compromise the claim" as well as "conduct or . . . statement[s] made during compromise negotiations about the claim."  Fed. R. Evid. 408(a); *see Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992) (explaining that "the timing of the offer and the existence of a disputed claim" are indicia as to whether "an offer is made in compromising . . . a claim" (quotation omitted)).  But Rule 408 allows the admission of settlement evidence "for another purpose" besides "to prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408.  Photon argues that the use of the email chains is permissible to show the process of renewal negotiations.  *See* Photon Opposition at 9-10.  The Court will consider the subject emails for that purpose and disregard any improper use of the emails under Rule 408, *i.e.*, to disprove the validity of ZoomInfo's claim.  *See BIC Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir.

2001) (noting that "in a bench trial," "the trial judge is . . . able to exclude improper inferences from his . . . own decision[]").  And in any event, neither email plays a material role in the Court's resolution of the case.

ZoomInfo's motion to preclude portions of Levine's testimony is therefore denied, except that the Court will not consider his testimony for any purpose that would run afoul of Federal Rule of Evidence 408.

## B.      Photon's Motion *In Limine*

Photon's motion *in limine* seeks two forms of relief.  First, it seeks to strike the portion of ZoomInfo's pre-trial memorandum of law addressing attorneys' fees, on the grounds that the Court will resolve any issues concerning fees after the damages bench trial.  Photon Motion at 1-2. Because the Court previously made clear that it will consider attorneys' fees after resolving damages, *see Photon*, 2021 WL 4482208, at *8 n.10; *see also* Dkt. 168, the Court will disregard the portion of ZoomInfo's memorandum addressing its application for attorneys' fees.[9]  Photon's request here is therefore granted.

Second, Photon seeks to strike certain paragraphs in Montgomery's direct testimony as inadmissible hearsay.  *See* Photon Motion at 2-5 (objecting to Montgomery Decl. ¶¶ 21-24, 26). Photon argues that those paragraphs "purport[] to recount ZoomInfo's out-of-court dealings, negotiations, and communications with unidentified customers."  *Id.* at 3-4.  Montgomery's statements are not hearsay, as they do not recount prior statements by herself or others, *see* Fed. R. Evid. 801(c), but rather the Court understands them to be based on Montgomery's personal

---

[9] The Court therefore does not address Photon's alternative arguments that the fees section of the pre-trial memorandum relies on evidence inadmissible under Federal Rules of Evidence 408 and 802.  *See* Photon Motion at 2.

knowledge of ZoomInfo's pricing practices from her experience as its Senior Director of Revenue. *See* Montgomery Decl. ¶ 6.  Photon's request to strike them is thus denied.

### III.    Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "As with any civil case, the [counterclaim] plaintiff bears the burden of proving the elements of [the plaintiff's] claim by a preponderance of the evidence. . . .  [I]t is within the province of the district court as the trier of fact to decide [which] testimony should be credited."  *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195-96 (S.D.N.Y. 2019) (internal quotations and citations omitted).

As the Court previously resolved liability on summary judgment, *see Photon*, 2021 WL 4482208, the parties' evidentiary submissions at trial were limited to the calculation of damages. The Court thus makes findings of fact solely on the issues relevant to that calculation.

### A.    Length of Unauthorized Use of ZoomInfo's Data

At the relevant time, ZoomInfo used "seed records" and a program called Catcher to detect unauthorized use of its data.  Simon Decl. ¶¶ 6-15.  A seed record is system-generated, and includes a random name, along with an email address and telephone number, which belongs to either ZoomInfo or one of its affiliates.  *Id.* ¶ 7.  When a customer downloads or exports ZoomInfo's data, ZoomInfo's system generates a seed record to be included in addition to other contact records being downloaded or exported.  *Id.* ¶¶ 7-8.  The seed records generated by ZoomInfo are unique to each download from ZoomInfo's platform, such that a seed record received by one ZoomInfo client will not be provided in a download by another client.  *Id.* ¶ 10.  Because ZoomInfo retains records of information associated with each seed record, ZoomInfo can determine the customer account and individual user who downloaded the specific seed record.  *Id.* ¶ 11.  Thus, ZoomInfo's

logs of emails sent to seed records are evidence of the use of the data sets the seed records were concealed within. *See id.* ¶¶ 9-11. ZoomInfo uses Catcher to identify emails sent to seed record accounts from unauthorized users. *Id.* ¶ 13. "Photon does not dispute ZoomInfo's [seed record] logs for purposes of" calculating Photon's time of use. Photon Memorandum at 8.

Photon's authorization to access ZoomInfo's data expired on May 16, 2018. Montgomery Decl. ¶ 43; Tr. 8:2-5. Yet, "[b]etween May 17, 2018 and August 13, 2020, ZoomInfo received 420 emails to seed email addresses downloaded by Photon." Simon Decl. ¶ 17 (citing ZoomInfo Exh. X). During an eight-month period within that timeframe, from November 1, 2018 to June 30, 2019, ZoomInfo received no emails to the seed record email addresses associated with Photon's downloads. ZoomInfo Exh. X. The Court therefore concludes that ZoomInfo has proved, by a preponderance of the evidence, Photon's use of ZoomInfo's data from May 17, 2018 to October 31, 2018, a period of about five-and-one-half months, and from July 1, 2019 to August 13, 2020, a period of about thirteen-and-one-half months, for a total of nineteen months. *See id.*

From January 23, 2018 to March 13, 2018, ZoomInfo's seed record email addresses associated with Photon's downloads also received emails from Mark Thompson, an employee of a company called Packyge. Simon Decl. ¶¶ 19-29. Packyge, however, was not a ZoomInfo customer, did not have access to ZoomInfo's database, and was not an authorized user under the EULA. *Id.* ¶ 20. The seed record email addresses that Packyge emailed were from five datasets that two Photon employees downloaded from the ZoomInfo database on January 9, 2018 and March 5, 2018. *Id.* ¶¶ 21, 25-26. The trial proof thus also established, by a preponderance of the evidence, that Photon provided Packyge access to certain of ZoomInfo's data that Photon had downloaded, and that Packyge used that data for approximately two months.

**B.      Market Value of ZoomInfo's Control of its Data**

Next, the Court considers the market value of ZoomInfo's control of the data that it lost on account of Photon's breaches of the EULA.  The Court's valuation begins with examining the parties' contract.  Photon purchased four datasets and associated services from ZoomInfo for a term between May 11, 2017 and May 10, 2018.  Montgomery Decl. ¶¶ 13-15, 18, 30.  ZoomInfo's total "list price" for these materials and services was $106,500.  *Id.* ¶ 20; *see also* ZoomInfo Exh. C at 1.  For the first year, Photon received a $51,080 promotional discount off the list price, as well as free access to the ZoomInfo platform for five users, worth $7,500.  Montgomery Decl. ¶ 20; *see also* ZoomInfo Exh. C. at 1.  As a result, Photon paid $47,920 for its first year of service.  Montgomery Decl. ¶ 30; *see also* ZoomInfo Exh. C at 1.

Photon's receipt of these promotional discounts aligns with ZoomInfo's general practices.  Only approximately eighteen percent of new ZoomInfo customers pay the list price for its services, while the remainder receive discounts.  Montgomery Decl. ¶ 21.  ZoomInfo also publicly advertises ten percent discounts on two-year terms and fifteen percent discounts on three-year terms.  ZoomInfo Exh. D at 6.

When a purchaser's initial subscription ends and the purchaser seeks renewal, ZoomInfo's promotional discount expires, and ZoomInfo expects negotiations to start at the list price.  Montgomery Decl. ¶ 23.  Nevertheless, ZoomInfo offers continued discounts based on a variety of factors, including ZoomInfo's rates of sales and renewals, the likelihood that the client will work with ZoomInfo long-term, and the length and scope of the prospective contract.  *Id.* ¶ 24.  ZoomInfo "routinely . . . require[s] at least a 10% to 20% increase from the prior subscription agreement amount."  *Id.* ¶ 26.  ZoomInfo followed those practices in its renewal negotiations with

Photon.  Photon was ZoomInfo's seventh heaviest user, so ZoomInfo expected to enter a long-term relationship with Photon.  *Id.* ¶¶ 28, 74.

On April 12, 2018, ZoomInfo employee Curtis Hatch offered Photon a twelve-month renewal of its previous subscription at $53,700, a twenty-four-month or twenty-six-month renewal at $50,500 per year, or a forty-eight-month renewal at $49,000 per year.  *Id.* ¶ 29.  Two weeks later, Levine informed Hatch that Photon was interested in renewing its current access, plus additional access to a database from a company called RainKing that ZoomInfo had recently acquired, for twenty-four months at $49,000 per year.  *Id.* ¶¶ 33-34; ZoomInfo Exh. H.  Based on those discussions, ZoomInfo expected that renewal was imminent.  Montgomery Decl. ¶¶ 43-44.  On May 15, 2018, ZoomInfo offered Photon a continuation of its current package, though with one database substituted for another, for twenty-four months at $49,000 per year, and on May 30, 2018, ZoomInfo sent Photon a contract reflecting those terms.  *Id.* ¶¶ 45, 55; ZoomInfo Exh. M.  On June 27, 2018, ZoomInfo informed Photon that it would raise the price to $60,000 per year after June 30.  Montgomery Decl. ¶¶ 68-70; ZoomInfo Exh. Q.  ZoomInfo described that price as "below [ZoomInfo's] new customer pricing, but in line with the average price point clients are currently paying."  ZoomInfo Exh. Q at 2.  On August 7, 2018, ZoomInfo again offered Photon a two-year renewal at $49,000 per year, plus a free month of service.  Montgomery Decl. ¶ 74.  On that day, Levine stated that Photon would not renew until October, *id.* ¶ 75; ZoomInfo Exh. T, and on August 20, ZoomInfo initiated discussions regarding Photon's continued use of ZoomInfo's data, Montgomery Decl. ¶ 76.  Montgomery testified that she initially believed that reaching an agreement as to Photon's continued use "was simply a matter of timing, as Photon seemed as though it wanted to" renew.  *Id.* ¶ 83.

The Court concludes that the $60,000 figure, which Hatch described as near "the average . . . [that] clients are currently paying" for ZoomInfo services similar to those Photon used, ZoomInfo Exh. Q, best reflects those services' value.  While ZoomInfo seeks the full list price of its services, *see* ZoomInfo Memorandum at 2-4, the evidence indicates that few ZoomInfo customers pay that price.  Montgomery testified that 82% of new customers pay below ZoomInfo's list prices.  *See* Montgomery Decl. ¶ 21.  And while Montgomery explained that renewal negotiations "begin with the list price," *id.* ¶ 23, she described ZoomInfo's "routine[]" practice with respect to renewals as "requir[ing] at least a 10% to 20% increase from the prior subscription," *id.* ¶ 26.  That practice roughly aligns with ZoomInfo's $60,000 per year quote, which represented approximately a 25% increase from ZoomInfo's initial contract with Photon at $47,920 per year.  And ZoomInfo itself represented that $60,000 per year is near the average price paid by its customers for the relevant package of services.  ZoomInfo Exh. Q.

Photon argues for a price of $49,000 per year, the lowest figure that ZoomInfo offered to Photon for a renewal.  Photon Memorandum at 4.  However, the evidence indicates that ZoomInfo offered Photon a particularly large discount due to ZoomInfo's expectation of an unusually long-term and profitable relationship.  *See* Montgomery Decl. ¶¶ 28, 74; *see also* ZoomInfo Exh. Q.  The prior price point is thus not representative of the typical price that a customer in Photon's position at the time of breach would pay—*i.e.*, a customer purchasing a nineteen-month renewal, but without any expectation of a long-term future relationship.  The price of $60,000 per year thus better reflects the value of ZoomInfo's control of its data under these circumstances.

Photon also argues that it did not receive the full value of ZoomInfo's services post-breach because ZoomInfo did not continue to update its data or provide customer support.  Photon Memorandum at 7-8.  To account for data decay from the lack of updates, Photon advocates that

the damages should be discounted by thirty percent for the first year, then sixty percent for the second year, *id.* at 10, relying principally on a ZoomInfo marketing website that (self-servingly) claims that "30% of [marketing] data goes bad every year," Photon Exh. 5 at 5. Indeed, ZoomInfo promoted its data updates as an important part of its service. *See* Photon Exhs. 3, 4, 5. Photon, however, downloaded tens of millions of ZoomInfo records, so even accounting for data decay, Photon possessed a vast amount of "good" ZoomInfo data. *See* ZoomInfo Memorandum at 9-10; *see also* ZoomInfo Exhs. Y, Z (records of Photon downloads of ZoomInfo's data). Indeed, Photon's willingness to continue to access ZoomInfo's data through August 13, 2020 demonstrates that Photon continued to value that data. *See* Simon Decl. ¶ 17. With that said, some degree of reduction in value is appropriate to account for data decay, as ZoomInfo concedes that updated contact information is a valuable feature of its product. *See* Tr. 7:1-5 (Montgomery testifying that up-to-date contact information is "part of the value of being a subscriber").

The Court is not persuaded, however, by Photon's argument that the value of the data should be reduced because it did not receive customer support. No evidence was presented at trial to indicate that Photon encountered any technological issues with ZoomInfo's data after May 16, 2018, or, for that matter, at any point. And while Montgomery agreed that ZoomInfo's customers can receive support, *see* Tr. at 7:6-18, the scant record does not allow the Court to make any finding as to the value of that support.

Considering the extent of Photon's downloading of ZoomInfo's data, the value of the data updates, and the absence of evidence that Photon suffered from any lack of customer support, the Court finds that a reduction of ten percent from the $60,000 annual price set above is appropriate. ZoomInfo's services that Photon retained in violation of the EULA therefore were worth $54,000 per year, or $4,500 per month.

## IV.    Conclusions of Law

As discussed in the Court's Opinion and Order granting ZoomInfo summary judgment, because Photon deprived ZoomInfo of "an item with a determinable market value," *i.e.*, ZoomInfo's rights to limit the distribution and use of its data, "the market value at the time of breach is the measure of damages."[10]  *Photon*, 2021 WL 4482208 at *7 (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990)).  When "the asset at issue has a sales history . . . it is well-established that a recent sale price . . . negotiated by parties at arm's length, is the best evidence of its market value."  *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) (quotations omitted).  Similarly, "the price at which a party offered to sell the subject

---

[10] Photon argues that ZoomInfo failed to show sufficient evidence of its lost profits.  *See* Photon Memorandum at 1-3.  The Court rejected the propriety of a lost profits metric on summary judgment, *see Photon*, 2021 WL 4482208, at *7-8, which is the law of the case, *see Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quotations omitted)).

But even crediting a lost profits metric, Photon's argument would fail.  On a lost profits theory, the nonbreaching party may collect the contract price less the variable costs that it saved as a result of the breach.  *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995).  Photon argues not that ZoomInfo actually saved variable costs as a result of breach, but that ZoomInfo failed to show its lack of variable costs with sufficient certainty. *See* Photon Memorandum at 1-3; *but see* ZoomInfo Exh. C at 1 (showing that Photon purchased off-the-shelf datasets); Montgomery Decl. ¶¶ 7-11, 15 (same); ZoomInfo Memorandum at 9 (arguing that as such, ZoomInfo had no variable costs specifically attributable to the Photon engagement).  But under New York law, once "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer."  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *see also Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109-11 (2d Cir. 2007) (same, further explaining that "money that the breaching party agreed to pay under the contract" constitutes "general damages," that "certainty of amount is not an element of general damages in New York," and that a breaching party thus may not "escape liability because the amount of damage which he has caused is uncertain").  ZoomInfo clearly sustained damage, so even if the Court were to apply a lost profits metric, it would be Photon's burden to clarify ZoomInfo's variable costs if Photon wished to benefit from an offset stemming from those variable costs.  Photon introduced no such evidence.

property in an unsuccessful transaction" may be relevant. *Id.* at 179.  Thus, the Court considers the history of ZoomInfo's sales of rights to use its data, including to Photon, when assessing damages.  For the reasons discussed above, the Court concludes that $54,000 per annum, or $4,500 per month, was the market value of the rights to the data that Photon misappropriated.  Since the evidence at trial established that Photon used ZoomInfo's data without authorization for nineteen months, and provided ZoomInfo's data without authorization to Packyge, allowing Packyge to use the data for two months, ZoomInfo is entitled to $94,500 in damages.

ZoomInfo advances two legal arguments for its position that Photon should be held accountable for a longer period of use.  First, ZoomInfo seeks damages "through the date that Photon demonstrates that it destroyed and ceased using the data—*i.e.*, through trial."  ZoomInfo Memorandum at 4; *see also id.* at 7.  ZoomInfo argues that, despite discovery requests on this topic, "Photon provided no evidence to indicate it . . . ever ceased using ZoomInfo's data."  *Id.* at 5.[11]  ZoomInfo makes the same argument with respect to Packyge.  *See id.* at 7-8.  In substance, ZoomInfo requests an adverse inference against Photon on the length of the breach due to Photon's discovery failures.  But while ZoomInfo's counsel represented during trial that "nothing was produced [by Photon], not a shred of evidence in discovery" regarding Photon's use of ZoomInfo's data, Tr. at 57:12-23, *see also* ZoomInfo Memorandum at 4-5, 8 (same), ZoomInfo provides no

---

[11]  In discovery, ZoomInfo requested "[a]ll Documents concerning [Photon's] use of any and all data and/or information received from [ZoomInfo]," to which Photon responded that it would "meet and confer with Defendant . . . subject to . . . reasonable limitations, [and] produce certain documents and communications."  ZoomInfo Exh. AM at 6-7.  Photon tendered a similar response to ZoomInfo's demand for "[a]ll Documents and Communications concerning [Photon's] marketing and/or marketing campaigns."  *Id.* at 4-5.  Photon objected to a request for "[a]ll Documents sufficient to show all sales, marketing, and advertising efforts undertaken by [Photon] using [ZoomInfo's] information."  *Id.* at 7.

evidence regarding Photon's document production or the circumstances of Photon's alleged nondisclosure.

In the absence of a record, the Court cannot determine whether Photon spoiled, refused to turn over, or simply lacked responsive evidence.  Regardless, the Court cannot draw an adverse inference.  Federal Rule of Civil Procedure 37(e)(2)(A) permits the Court to draw an adverse inference in response to spoliation of electronically stored information "only upon finding that the party acted with intent to deprive another party of the information's use in the litigation . . ."  Fed. R. Civ. P. 37(e).  ZoomInfo has not made such a showing.  Likewise, Rule 37(b)(2)(A) permits the Court to "direct[] that . . . designated facts be taken as established . . . as the prevailing party claims" when a party "fails to obey an order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A), but "[t]here must be a valid court order in place before sanctions may be imposed pursuant to Rule 37(b)(2)," *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1364 (2d Cir. 1991).  There is no such order in place; in fact, ZoomInfo never moved to compel.  And a motion for sanctions at this point would be too late: "[a] motion for Rule 37 sanctions should be promptly made . . . [and] unreasonable delay may render such motions untimely."  *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 M.D. 1570 (GBD) (SN), 2018 WL 4096106, at *2 (S.D.N.Y. Aug. 27, 2018) (cleaned up) (declining to issue sanctions after the close of discovery).[12]  Thus, ZoomInfo, which bears the burden of establishing damages, has offered evidence that only proves a nineteen-month breach in connection with Photon's unauthorized use of ZoomInfo's data and a two-month breach in connection with Photon's unauthorized provision of ZoomInfo's data to Packyge.

---

[12] Notably, in arguing for damages in its summary judgment briefing, ZoomInfo did not argue that Photon should be liable for a term of use beyond a term beginning in May 2020, during which ZoomInfo received from Photon the final emails to seed record accounts.  *See* Dkt. 83 at 18.

Second, ZoomInfo also seeks to charge Photon for full one-year subscriptions, rather than for subscriptions for fractions of one year.  *See* ZoomInfo Memorandum at 4, 7.  ZoomInfo provides no argument in support of this approach or evidence that its minimum subscription period is one year.  And again, ZoomInfo bears the burden of proving its entitlement to damages.  While ZoomInfo claims that "Ms. Montgomery testified" that "no subscriptions last less than a year," ZoomInfo Memorandum at 1, it cites no supporting evidence for this assertion, and no such testimony came in at trial, *see generally* Montgomery Decl.; Tr.  And during contract negotiations, ZoomInfo did provide Photon a brief interim extension to its subscription, Montgomery Decl. ¶¶ 42-43, and at one point offered a twenty-six month renewal, *id.* ¶ 29.  The Court thus declines to hold Photon liable for full-year subscriptions for each of the contract years in which it wrongfully retained or shared ZoomInfo's data, as opposed to *pro rata* monthly rates based on an annual subscription rate.

## V.    Conclusion

For the foregoing reasons, the Court grants ZoomInfo's motion *in limine* in part and denies that motion in part, grants Photon's motion *in limine* in part and denies that motion in part, and concludes that ZoomInfo is entitled to $94,500 in damages.  The Clerk of Court is respectfully directed to close the motions *in limine* at Docket Numbers 154 and 157.  The Court also grants the sealing requests at Docket Numbers 156, 164, 170, 173, and 178.  These Findings of Fact and Conclusions of Law will initially be filed under seal.  Should either party seek redactions in the publicly filed version of these Findings of Fact and Conclusions of Law, that party shall file a letter requesting such redactions and justifying them pursuant to *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and other relevant authorities, by August 19, 2022.

The parties shall appear at a status conference to discuss the resolution of remaining issues relating to attorneys' fees on August 19, 2022 at 11:30 a.m.  At the scheduled time, counsel for both parties shall call (866) 434-5269, access code 9176261.


      SO ORDERED.

Dated: August 9, 2022
      New York, New York

                                  JOHN P. CRONAN
                          United States District Judge